## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MARISOL MICHEO ACEVEDO** | **CIVIL NO. 15-** |
| **Plaintiff** | **GENDER DISCRIMINATION; DISABILITY DISCRIMINATION; RETALIATION; FAMILY MEDICAL LEAVE ACT; WRONGFUL DISCHARGE; DAMAGES** |
| **v.** | |
| **STERICYCLE OF PUERTO RICO, INC.; ÁNGEL RIVERA MORALES; OSVALDO SANTANA RIVERA** | |
| **Defendants** | **TRIAL BY JURY DEMANDED** |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW Plaintiff, Marisol Micheo Acevedo ("Micheo"), through the undersigned attorneys, and very respectfully alleges, states and prays:

### I. NATURE OF THE ACTION AND JURISDICTION

1. This action is brought pursuant to Title VII, 42 U.S.C. §§ 2000e *et seq*; the Civil Rights Act of 1991, 42 U.S.C. sections 1981a and 1988; Puerto Rico Law No. 100 of June 30, 1959, as amended; Puerto Rico Law No. 69 of July 6, 1985; the Americans with Disabilities Act ("ADA"), the Americans with Disabilities Act Amendments Act ("ADAAA"), 48 U.S.C. §§12101, *et seq.*; Puerto Rico Law No. 44 of July 2, 1985, as amended; the Puerto Rico Disabilities Act, Puerto Rico Law No. 53 of August 30, 1992, as amended; Puerto Rico Law No. 115 of December 20, 1991; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601-54; the Puerto Rico Unjust Dismissal Act, Law No. 80 of May 30, 1976., seeking compensatory, double, liquidated and punitive damages and equitable and injunctive relief to seek redress for defendants' discrimination on the basis of gender and

1

disability and retaliation against Micheo, as well as compensation for wrongful discharge under Law No. 80 and for violations of FMLA.

2. This court has jurisdiction to entertain this action pursuant to Section 706 of the Civil Rights Act (42 U.S.C. 2000e-5); 28 U.S.C. 1331 and 1343(4); Section 7 of the ADEA, 29 U.S.C. § 626(c)(1), and under 28 U.S.C. §§ 1331 and 1343(a)(4);   Its supplemental jurisdiction is also invoked pursuant to 28 U.S.C. § 1367(a) to hear the Commonwealth of Puerto Rico law claims because these are so related to the other claims as to which this court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(1) and (2), as the defendants reside in Puerto Rico and all the discriminatory and retaliatory employment practices alleged were committed within the judicial district comprising the Commonwealth of Puerto Rico.

4. On November 8, 2013, Micheo filed a timely charge of employment discrimination on the basis of gender and disability and of retaliation for exercising her right to oppose defendants' discriminatory and retaliatory conduct with the Anti-Discrimination Unit of the Department of Labor of Puerto Rico ("ADU").   The charge number with the ADU is uadau13-744C and the charge number at the Equal Employment Opportunity Commission ("EEOC") is 16H-2014-00105C.

5. Subsequently, on January 28, 2014, Micheo filed a second charge of retaliation against defendants before the EEOC.   The charge number is 515-2014-00345.

6. On November 19, 2014, the EEOC issued its Notice of Right to Sue as to charge number 515-2014-00345, and on December 10, 2014, it issued the same as to charge number 16H-2014-00105C. *See*, Exhibits 1 and 2.

7. The instant complaint is being filed with ninety (90) days of Micheo's receipt of the Notices of Right to Sue.

## II. THE PARTIES

8. Micheo is of legal age, female, a citizen of the United States and a resident of Bayamón, Puerto Rico, who began working for Stericycle of Puerto Rico, Inc. on April 15, 2012.

9. Micheo is an "employee" within the meaning of Title VII and within the meaning of all the legal provisions of Puerto Rico law upon which she predicates her claims for relief.

10. Micheo has been clinically diagnosed with severe depression.

11. At all relevant times, Micheo was an "employee with a disability" under the provisions of the ADA and ADAAA, and is within the protected class under those statutes as well as under their Puerto Rico counterparts.   In the alternative, defendants regarded Micheo as disabled.

12. Micheo is an "eligible employee" under FMLA, 29 U.S.C. § 2611(2)(A)(i)(ii).

13. Micheo is an "employee" under Puerto Rico Laws Nos. 44, 53, 69, 80, 100 and 115.

14. Micheo is an employee under all of the federal and local statutes upon which she bases her requests for relief.

15. Co-defendant Stericycle of Puerto Rico, Inc. ("Stericycle") is, and at all times hereinafter mentioned was, a corporation duly created under the Laws of and with its principal place of business in the Commonwealth of Puerto Rico.

3

16. Stericycle is a for profit corporation registered with the Commonwealth of Puerto Rico Department of State.

17. At all times relevant herein, Stericycle has been Micheo's employer.

18. Stericycle is a "person" and an "employer" within the meaning of 42 U.S.C. Sec. 2000e(a) and (b) and within the meaning of all the legal provisions of Puerto Rico law upon which Micheo predicates her claims for relief.

19. Stericycle employs more than twenty (20) employees on a daily basis as the term is defined in 42 U.S.C. §12114.

20. Stericycle is an "employer" within the meaning of 29 U.S.C. § 2611.

21. Stericycle employs fifty (50) or more employees during each working day as the term is defined in 29 U.S.C. § 2611.

22. Stericycle employs more than 500 employees on a monthly basis.

23. Stericycle is an "employer" under Puerto Rico Law No. 100.

24. Stericycle is an "employer" under Puerto Rico Law No. 69.

25. Stericycle is an "employer" under Puerto Rico Law No. 115.

26. Stericycle is an "employer" under Puerto Rico Law No. 80.

27. Co-defendant Ángel Rivera Morales ("Rivera") was, at all times relevant to this complaint, General Manager at Stericycle.

28. Rivera is an "employer" under Puerto Rico Laws Nos. 69, 100 and 115.

29. Co-defendant Osvaldo Santana Rivera ("Santana") was, at all times relevant to this complaint, Sales & Marketing Manager at Stericycle and Micheo's immediate supervisor.

30. Santana is an "employer" under Puerto Rico Laws Nos. 69, 100 and 115.

31. All co-defendants may be collectively referred to as "defendants".

### III. THE FACTS

32. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

33. Micheo began working for Stericycle on April 15, 2012, as a Field Sales Representative under the supervision of Santana, who was Manager of Sales & Marketing.

34. Prior to starting at Stericycle, Micheo had worked as a medical propagandist for another company and she had also worked in the banking industry.

35. On or around the time that Micheo began working for Stericycle, the company began developing a project called BioSystem and assigned Micheo to work on the stage of starting and developing the project.

36. This meant that Micheo would work on starting and developing the BioSystem project before the company launched it.

37. Micheo met with Santana and asked him what were the type of duties which she would have to perform once the BioSystem project was launched and inquired as to what her salary would be.

38. Santana responded to Micheo that the duties of that position were those of a technician in charge of picking up "sharp containers," which are containers that have sharp objects (such as needles) inside them.

39. Santana also told Micheo that the position paid only $7.25 per hour.

40. Santana further told Micheo that he knew that these duties were completely different to the duties that Micheo used to perform as a medical propagandist and that he also knew that the $7.25 per hour salary was lower than the salary Micheo had been earning when she held said job.

5

41. In view of the above statements made by Santana, he told Micheo that it would be best for her to not occupy the BioSystem Project position once the project was launched.

42. At that time, Micheo trusted Santana's representations regarding the duties and salary of the position, and as a result, she told Santana that she agreed with him that it was best for her not to occupy the position.

43. Therefore, Micheo remained in her Sales position at that time.

44. The BioSystem Project position which Micheo and Santana had discussed was assigned to Jorge Rodríguez ("Rodríguez").

45. Rodríguez had started working for Stericycle in the same month as Micheo, April 2012.

46. Up until the moment in which he was assigned to the BioSystem Project position, Rodríguez had been occupying a Sales position similar to Micheo's position.

47. When Rodríguez was assigned to the BioSystem Project position, Santana began to refer to Rodríguez as the "Project Manager" of BioSystem, which was contrary to Santana's earlier representations that the position was that of a technician in charge of picking up sharp containers.

48. Rodríguez' highest educational degree is a high school diploma.

49. In September 2012, Santana officially announced that Rodríguez was the BioSystem Project Manager.

50. The salary paid to Rodríguez as Project Manager was higher than $7.25 per hour.

51. Later in 2012, one of Stericyle's transportation supervisors was terminated, and Santana assigned Rodríguez to occupy the transportation supervisor position.  As a result, the Project Manager position became vacant.

52. In light of the vacancy, in January 2013, Micheo inquired again with Santana regarding the BioSystem Project Manager position and requested that he consider her for the same.

53. Micheo reminded Santana that it had been her who worked on the development phase of the project and that she was qualified for the position.

54. Santana agreed to let Micheo *perform the duties* of the BioSystem Project Manager position; however, he refused to let her officially occupy the position.  "That way," he claimed, "I don't have to pay the Project Manager salary." ("Así me economizo la plaza de 'Project Manager'.").  Santana added that Micheo would also continue performing her Sales duties.

55. Santana's decision meant that Micheo would now have to perform both the BioSystem Project Manager duties and her Sales duties, but without officially being named as Project Manager and without being paid the Project Manager salary, contrary to what happened with Rodríguez.

56. For the second time, Micheo trusted Santana's representations at that time and believed that the BioSystem Project Manager position would not exist at Stericycle.

57. After this meeting between Micheo and Santana, and throughout the months of January, February and March 2013, Santana turned Micheo's work environment into a hostile one and began to discriminate against her due to her gender.

58. Micheo asked that she be allowed to participate in a series of trainings, but Santana refused to allow her to participate in these.

59. Santana would demand that Micheo comply with the same sales goals as her fellow male peers *in addition to* carrying out all the duties that corresponded to the allegedly non-existent BioSystem Project Manager position.

60. Back when Rodríguez had been working as Project Manager or or around September 2012, Santana would not demand that Rodríguez meet the same amount of monthly sales goals, and indeed, Santana eventually told Rodríguez to stop focusing on sales and to focus entirely on the Project Manager duties.

61. Micheo approached Santana and complained about the fact that he was overloading her with work and that she was being treated differently than her fellow co-workers.

62. Micheo's hope was that Santana would do the same thing he did with Rodríguez, and tell Micheo to focus entirely on the Project Manager duties, especially in view of the fact that Santana knew that Micheo was qualified to perform those duties.

63. However, to the contrary, Santana told Micheo to stop focusing on the BioSystem Project Manager duties and to instead just continue focusing on Sales.

64. This order from Santana deprived Micheo, yet again, of being able to perform the Project Manager duties and, therefore, of an opportunity for professional advancement within the company.

65. After the meeting in which Santana told Micheo to stop focusing on the BioSystem Project and to instead focus entirely on her Sales duties, Micheo requested another meeting with Santana.

66. During this meeting, Micheo reiterated to Santana her complaint that he was not treating her in the same way as he was treating her fellow employees.   She added that Santana was retaliating against her for complaining of this disparate treatment.

67. The BioSystem Project was officially launched on March 5, 2013.

68. Micheo realized that Stericycle did not have personnel and/or technicians available to perform the duty of changing the sharp containers.

8

69. Micheo notified this situation to Santana.

70. Santana responded that, if there was no personnel, then Micheo should go and do this herself.

71. Santana was aware since 2012 that Micheo did not have training as a technician in charge of handling sharp containers.   Indeed, this was the excuse that Santana had originally given to Micheo so that she would not occupy the BioSystem position, when he claimed that the duties of that position involved handling the sharp containers.

72. Furthermore, when Santana instructed Micheo to go handle the sharp containers herself, Santana was aware that Micheo did not have the materials necessary to perform these duties, such as gloves and a mask.

73. Micheo discovered on March 22, 2013 that a seminar was being given by EHS Manager in order to train people on how to transport the BioSystem carts in which the sharp containers were placed.

74. Micheo requested that Santana let her participate in the seminar.

75. Santana denied Micheo's request, claiming that she "should not waste her time with that."

76. Defendants discriminated against Micheo on account of her gender by purposely excluding her from trainings and seminars (including the cart-transportation seminar), and by giving preferential treatment to Rodríguez over Micheo with regards to the Project Manager position, its duties and salary, as well as with regards to the assignment of work to each of them while they were performing BioSystem duties.   Defendants also discriminated against Micheo on account of her gender by asking her to meet the same sales goals as her fellow male counterparts, while still demanding that she fulfill the BioSystem duties.

77. Furthermore, the order depriving Micheo of her BioSystem duties and commanding her to focus only on Sales duties was in retaliation against Micheo for having complained to Santana in an earlier meeting of his disparate treatment.

78. On April 15, 2013, which was the first anniversary of Micheo's employment with Stericycle, Micheo sent a written memorandum to Stericycle's Human Resources Department.

79. In the April 15, 2013 memorandum, Micheo complained that Santana was treating her differently than he was treating her fellow co-workers.   Micheo also stated in this memorandum that she had told Santana that he was retaliating against her.

80. At the end of the memorandum, Micheo asked that Stericycle not retaliate against her for denouncing the acts which she had informed in the memorandum.

81. Micheo's memorandum was received by Stericycle Human Resources Manager, Monica Bloomfield ("Bloomfield").

82. Bloomfield is located at Stericycle's Illinois offices.

83. Bloomfield acknowledged receipt of the memorandum on the same date in which Micheo sent it.

84. Bloomfield's e-mail acknowledging receipt of the memorandum was in Spanish.

85. Bloomfield can read and write Spanish.

86. In her e-mail acknowledging receipt of Micheo's memorandum, Bloomfield told Micheo that she would examine all of the documents personally and that she would contact Micheo soon to go more into detail.   Bloomfield asked for Micheo's telephone number in order to contact her.

87. Micheo replied and provided her telephone number to Bloomfield.

88. Micheo engaged in protected activity under Title VII when she complained in person to Santana and then via the written memorandum to Stericycle's Human Resources Department and Bloomfield of the discriminatory and retaliatory conduct to which she was being subjected.

89. As a result of complaining of defendants' discriminatory and retaliatory conduct, Micheo became the victim of further discrimination and retaliation at the hands of defendants.

90. After Micheo submitted her memorandum, during the same month of April 2013, Stericycle deprived Micheo of her sales commissions.

91. Pursuant to Micheo's employment agreement with Stericycle, Micheo was entitled to monthly sales commissions.

92. April 2013 was the last month for which Stericycle made a payment for sales commissions to Micheo.

93. Micheo was also moved to a different office.   She would now be under the supervision of Antonio González Aguiar ("González").

94. Bloomfield did not investigate the issues raised by Micheo in her memorandum.

95. Bloomfield never called and/or otherwise communicated with Micheo regarding the memorandum, as she had promised Micheo she would do "soon" after receiving the memorandum.

96. Since Micheo was still interested in occupying the Project Manager position, she requested from González, her new supervisor, that she be allowed to occupy the same, but González denied Micheo's request by claiming that "the positions had been frozen." ("Congelamos las plazas".)

97. On September 18, 2013, Santana called Micheo via telephone.

98. During the September 18, 2013 telephone conversation, Santana ordered Micheo to start explaining to Rodríguez all the details of the duties she was carrying out.

99. A few days later, on September 23, 2013, Santana informed Micheo that he would be her supervisor again and that she would return to the Sales Department.

100. In light of the fact that Santana continued to be completely unclear as to which position Micheo would occupy, Micheo met with Santana on September 27, 2013 and asked him to explain what her position and duties would be and whether or not she would receive a salary increase.

101. Santana responded that Micheo's position would now be that of "supervisor" and that she would not receive a salary increase.

102. Furthermore, during his meeting with Micheo, Santana drew for Micheo a chart which reflected what Santana claimed would be the hierarchical structure of Stericycle employees.

103. Santana did not include a Project Manager position in the chart he drew for Micheo.

104. The chart drawn by Santana reflected that Micheo would be in charge of supervising several employees.

105. The chart drawn by Santana reflected that Micheo would be at the top of the hierarchical structure in her area.

106. Micheo took a photograph of the chart drawn by Santana.

107. On that same date, Santana sent an e-mail to Micheo and to a recruiting company, in which he informed that Micheo would now be in charge of recruiting personnel and of approving payroll.

108. Defendants' decision to add the duties of recruiting personnel and approving payroll were as part of an effort to continue pressuring Micheo and burdening her with work unrelated to her duties.

109. On October 4, 2013, a personnel meeting was held at Stericycle.  Santana, Micheo and Rodríguez were all present during this meeting, as well as other employees.

110. During the October 4, 2013 meeting, Santana projected a chart which displayed a hierarchical structure of the Stericycle employees.

111. The chart displayed by Santana during the October 4, 2013 meeting was completely different to the chart which Santana had drawn for Micheo during their meeting of September 27, 2013 and of which Micheo still has a photograph.

112. Prior to the October 4, 2013 meeting, neither Santana nor anyone at Stericycle had shown Micheo the chart which Santana projected during the October 4, 2013 meeting.

113. The chart indicated that Rodríguez was BioSystem Project Manager as well as the person in charge of the entire Sales Division.

114. The chart also indicated that Micheo was under Rodríguez in the hierarchical structure, and that Rodríguez would now be her immediate supervisor.

115. At Stericycle of Puerto Rico, Inc., no woman has ever held a Manager position.

116. At Stericycle of Puerto Rico, Inc., no woman has ever held a position higher than a supervisor position.

117. Defendants chose Rodríguez over Micheo for the Project Manager position as part of their discriminatory motive to avoid that women, such as Micheo, occupy high level positions within the company.

118. Defendants' decision to select Rodríguez instead of Micheo for the Project Manager position in 2013 was discriminatory on the basis of Micheo's gender, and in further retaliation against Micheo for having complained both verbally to Santana and through the April 15, 2013 memorandum of the discriminatory and retaliatory treatment to which she was being subjected.

119. The alleged "supervisor" title assigned to Micheo's position was a sham in order to cover up the fact that Micheo had actually been demoted by defendants.  This was confirmed when Santana revealed the chart which reflected that Micheo would now be a subordinate of Rodríguez, and which was completely contrary to the chart that Santana had drawn for Micheo on September 27, 2013.

120. The alleged "supervisor" title assigned to Micheo's position was as part of defendants' efforts to avoid that women, such as Micheo, hold positions higher than that of "supervisor" at the company.

121. González' claim that Micheo could not occupy the Project Manager position because the positions had been "frozen" was a false excuse fabricated by defendants so that Micheo would, yet again, believe that the Project Manager position would not exist.

122. Santana's order of September 18, 2013 in which he asked Micheo to explain everything about her duties to Rodríguez was aimed at preparing Rodríguez for the Project Manager position.   Defendants knew that Micheo was better qualified than Rodríguez to occupy the position, but defendants had already decided that Rodríguez would be the Project Manager, because of their motivation to discriminate and retaliate against Micheo.

123. Rodríguez' salary as Project Manager was higher than Micheo's salary in the position in which she would now be Rodríguez' subordinate.

124. During and after the October 4, 2013 meeting in which the chart was projected, Micheo complained to Santana that the demotion was discriminatory and retaliatory.

125. In response to Micheo's complaint about defendants' discrimination and retaliation against her, on October 8, 2013, Rivera and Santana gave Micheo a disciplinary memorandum in which she was reprimanded for her "behavior" during the October 4, 2013 meeting.

126. Micheo had not engaged in any improper behavior during the meeting.   Rather, she had simply exercised her right to complain of the discriminatory and retaliatory treatment to which she was being subjected.

127. There was no reason to give the disciplinary memorandum to Micheo other than to retaliate against her for engaging in protected conduct under Title VII when she complained of the unlawful demotion.

128. The disciplinary memorandum was handed personally to Micheo by Rivera and Santana during a meeting in which only the three of them were present.

129. During the meeting, Rivera and Santana stared at Micheo with hostility.

130. Rivera had recently been appointed as General Manager of Stericycle.

131. During the meeting, Rivera stated in a hostile tone: "I don't know what promises the previous management made to you, but the decision for [Rodríguez] to be the Project Manager was made by this management and it is a final decision." ("No sé qué promesas te hizo la gerencia anterior, pero la decisión de que [Rodríguez] sea 'Project Manager' la tomó esta gerencia y es una decisión final".)

132. Luis Barbero Díaz ("Barbero"), who had occupied the General Manager post before Rivera, had told Micheo in July 2013 that she would be the one selected for the Project Manager position.   Barbero was later promoted to a position at Stericycle's Miami branch.

133. On October 9, 2013, Santana called Micheo and reprimanded her and yelled at her because of the fact that she was working from home.

134. Micheo responded to Santana that she was at home working on the payrolls and that, after that, she was scheduled to go to Hospital San Lucas.   The payrolls were due on that day.

135. The other Stericycle employees who were under Santana's supervision would at times perform their duties from home and Santana would neither reprimand them nor yell at them for this.

136. Micheo was the only employee under Santana's supervision who was reprimanded and yelled at for performing duties from her home.

137. Furthermore, ever since Micheo started working for Stericycle, Micheo had agreed with Santana that she could perform duties from home.

138. Micheo was emotionally injured as a result of the hostile, discriminatory and retaliatory work environment to which defendants were subjecting her.

139. As a result, on that same day, October 9, 2013, Micheo reported for treatment at the Clínica Salus, where she was evaluated by Dr. Luis A. Díaz Rosado, who is a clinical psychologist.

140. Dr. Díaz issued a medical certificate ordering that Micheo rest until October 14, 2013.

141. However, on October 11, 2013, in light of the fact that Micheo continued to feel extremely nervous and emotionally crippled due to defendants' discriminatory and retaliatory conduct, Micheo had to be hospitalized in the First Hospital Panamericano until October 18, 2013 in order to receive psychiatric treatment.

142. Micheo was diagnosed with severe depression which was worsened by the hostile work environment to which defendants subjected her.

143. Micheo submitted to defendants the medical certificate which reflected her severe depression condition.

144. On October 20, 2013, Micheo sent an e-mail to Bloomfield and Santana, in which she stated: "As you are aware, last week I was hospitalized at the First Hospital Panamericano. The reason for mi hospitalization is that I suffer from recurrent major severe depression. For this reason, the First Hospital Panamericano extended my treatment for a partial hospitalization of an additional week.   Therefore, I request that those days be credited as sick days pursuant to the Family Medical Leave Act."

145. Micheo's e-mail of October 20, 2013 contained a valid request for leave for personal health conditions pursuant to FMLA.

146. The emotional instability caused by Micheo's condition began to make it difficult for her to perform her major life activity of working because her emotional state made it difficult to interact with the customers with whom she had to engage in order to perform her duties.

147. Micheo sought legal advice and, on October 22, 2013, she sent defendants, through her attorney, a letter indicating that she intended to file an administrative complaint of gender discrimination against defendants.

148. Micheo engaged in protected conduct under Title VII when she complained of gender discrimination through her attorney's letter of October 22, 2013.

149. When Micheo returned to work towards the end of October 2013, in response to her letter of October 22, 2013, defendants continued to retaliate against her for asserting her rights under Title VII and for requesting leave under FMLA, as well as to discriminate against her on account of her disability.

17

150. Micheo's new supervisor, Rodríguez, sent Micheo an e-mail reprimanding Micheo for not physically being in the office, despite the fact that he and defendants knew that Micheo's duties for that day involved being out on the street all day visiting several hospitals.

151. Notwithstanding, defendants, through Rodríguez, reprimanded Micheo because they wanted to punish her for complaining of their discriminatory conduct.  In addition, the reprimand was also aimed at continuing to emotionally pressure Micheo so that her mental condition would continue to worsen.

152. Stericycle was set to hold its annual golf tournament on November 1, 2013.

153. Approximately two days before the tournament (on or around October 30, 2013), Santana and Rodríguez summoned Micheo to a meeting.

154. During the meeting, Santana and Rodríguez informed Micheo that she would not be allowed to participate in the golf tournament.

155. All of the other supervisors and members of Stericycle's Sales Department were set to participate in the golf tournament, and Micheo would be the only one excluded.

156. Micheo was allowed to participate in the golf tournament that had been held the previous year (2012).

157. Micheo began to cry during the meeting and pleaded with Santana that she be allowed to participate in the tournament.   She reminded Santana that several of her BioSystem clients would be present at the tournament.

158. Santana relented and told Micheo that she could participate in the golf tournament.

159. The golf tournament was held on November 1, 2013.

160. Stericycle had hired independent contractors who would be at the counter helping with the process of registering for the tournament.

161. During the tournament of the previous year (2012), Micheo had helped the independent contractors with the registration process.

162. As she had done the previous year, during the November 1, 2013 golf tournament, Micheo joined the independent contractors and started to help them with the registration process.

163. Aside from helping the independent contractors, the other purpose for Micheo to be at the registration table was to provide the people who registered for the golf tournament with Stericycle business cards.

164. When Santana realized that Micheo was helping the independent contractors with the registration process, Santana went towards the registration table and, in front of everyone who was present, ordered Micheo in a hostile tone to stop helping the independent contractors.

165. Micheo complied with Santana's order and left the registration table.

166. Micheo had not been reprimanded and/or prohibited from collaborating at the registration table during the 2012 golf tournament.

167. Later that same day, during the tournament, Micheo complained to Santana as to why he had ordered her to stop helping the independent contractors.

168. Micheo reminded Santana that she had helped the independent contractors during the golf tournament of the previous year.

169. Santana remained silent and did not respond anything to Micheo.

170. One of Micheo's responsibilities with regard to the BioSystem Project was to deliver protective gear and equipment to technicians and other personnel who were implementing the project at the various hospitals.

171. On November 4, 2013, a technician at the Manatí Medical Hospital contacted Micheo and requested the protective equipment.

172. Micheo called Santana and informed him of the technician's request, but Santana prohibited Micheo from complying with this duty and did not authorize her to go to Manatí Medical Hospital to deliver the equipment.

173. Defendants' order prohibiting Micheo from complying with this duty constituted a deprivation of one of Micheo's essential duties at Stericycle.  Defendants purposely prohibited Micheo from fulfilling this duty so that, if any problems and/or accidents and/or health-threatening situations took place as a result of the lack of protective equipment at the hospital, any such problems would be attributed to Micheo.  This order was in retaliation against Micheo for asserting her rights under Title VII and FMLA, as part of an effort to justify future reprimands and other adverse employment actions.

174. In view of defendants' continued discriminatory and retaliatory treatment, on November 8, 2013, Micheo filed against defendants a charge of discrimination on the basis of gender and disability and of retaliation before the ADU.

175. Micheo engaged in protected conduct under Title VII, the ADA and Puerto Rico Laws No. 44, 69 and 115 when she complained of gender and disability discrimination and retaliation by filing her ADU charge of November 8, 2013.

176. As a result of filing the above charge, defendants not only continued but heightened their discriminatory and retaliatory campaign against Micheo.

177. Two days after the charge was filed, on November 10, 2013, Santana sent an e-mail to Stericycle employees in which he stated that November 28 and 29, 2013 were both holidays and that, therefore, there would be no work on either of those two days.

178. However, Santana did not include Micheo in his e-mail of November 10, 2013.

179. Santana purposely excluded Micheo from this communication despite the fact that it contained information to which she should have been privy as a Stericycle employee.

180. On November 12, 2013, Micheo sent an e-mail at 9:27 A.M. to Santana requesting his approval for the payment of a series of labels. In her e-mail, Micheo also copied Ms. Merimar Estrella ("Estrella"), another Stericycle employee.

181. At 11:38 A.M. Santana replied to both Micheo and Estrella, but in the text of his e-mail, he only addressed Micheo.

182. In this e-mail, instead of indicating whether or not he approved Micheo's request, he reprimanded Micheo for allegedly incurring in an additional expense to the company.

183. This was not true. Micheo had not incurred in any additional expense because it was still awaiting approval from Santana.

184. A few minutes later, at 11:58 A.M., Santana sent another e-mail to Micheo and Estrella, but in the text of this e-mail, he addressed only Estrella and stated the following: "Ok approved." ("Ok aprobado.")

185. Santana baselessly reprimanded Micheo for allegedly acting without his approval despite the fact that Micheo's e-mail was clear that his approval was still pending.

186. In any event, Micheo paid for the bills out of her own pocket and she indicated the same to Santana via e-mail. Therefore, there was no additional expense to the company and no reason to reprimand Micheo.

187. At approximately 1:20 P.M. of that same day, Santana called Micheo via telephone.

188. During the telephone call, Santana yelled at Micheo and stated that she was doing things incorrectly.

189. Micheo sent Santana an e-mail at 1:37 P.M., with copy to Rivera, in which she stated that Santana's telephone call of that date was an act of retaliation against her for filing a charge against defendants before the Anti-Discrimination Unit.

190. The next day, November 13, 2013, Micheo sent an e-mail to several Stericycle employees, including Santana, in which she informed that she had received an inventory from the Hospital Oncológico, and that the individuals in charge complained that the containers were sent to them unassembled.

191. Santana sent a response e-mail in which he reprimanded Micheo for informing the situation which she had expressed in her e-mail.

192. Micheo responded that all she had done was inform a complaint from other individuals involved in the project, and that it was her duty to inform situations of said nature.

193. On November 14, 2013, Stericycle was installing BioSystem at the Hospital Oncológico.

194. On that date, Micheo called Stericycle employee Christian Figueroa ("Figueroa") via telephone to inform him that she was handling company matters in Ponce on that day. Micheo asked Figueroa to inquire with Santana as to whether or not Figueroa could be present for the installation at the Hospital Oncológico, since she was in Ponce.

195. Figueroa communicated via e-mail with Santana regarding his conversation with Micheo.

196. Santana responded that it was he (Santana) who was coordinating the installation. Santana included Micheo in this e-mail, and accused her of engaging in insubordination and not following instructions.

197. Micheo responded to Santana's e-mail, and stated that she had never failed to follow his instructions and that the e-mail was clear that Micheo had not ordered Figueroa to go to the

installation, but rather, that she had asked Figueroa to inquire with Santana as to whether or not Figueroa could be present at the installation.

198. Micheo added that the reason why she did not call Santana directly and instead asked Figueroa to contact Santana himself was due to Santana's hostile attitude towards her and lack of respect.

199. Micheo further stated that she knew that the reason why Santana had been treating her with such hostility was because she had filed an administrative charge of discrimination and retaliation against defendants.

200. Micheo sent her e-mail to Santana, with copy to Rivera and Bloomfield.

201. Later that same day, Micheo sent another e-mail to Santana, Rivera and Bloomfield in which she stated that, as a result of the situations set forth in her previous e-mail, her emotional condition had worsened and she was forced to visit her physician. Subsequently, Micheo sent another e-mail on that same day to those three individuals to which she attached the medical certificate which indicated that, in light of Micheo's condition, she would not be able to work the next day.

202. Finally, Micheo reminded Santana that she was receiving treatment for her psychiatric condition, and that her physical and mental health were getting worse as a result of his hostile treatment.

203. As part of her work duties, Micheo was scheduled to visit the Hospital de la Concepción in Mayagüez on Monday, November 19, 2013, in order to handle the installation of BioSystem at that hospital.

204. Micheo sent an e-mail to Santana on November 14, 2013 requesting that Santana authorize her stay at the Holiday Inn Mayagüez for Monday, November 19, 2013, since she would be having to handle the Hospital de la Concepción installation on that day.

205. Santana responded by denying Micheo's request and informed her that he would be the one who would be in charge of the installation.

206. As part of Micheo's duties within the BioSystem Project, she had always been in charge of being present on the first day of installation at the different hospitals.

207. Defendants deprived Micheo of her duty to be present on the first day of the Hospital de la Concepción installation of BioSystem.

208. On Friday, November 22, 2013, a staff meeting was held at Stericycle.

209. During the staff meeting, Santana sent Micheo to go check the status of BioSystem at Hospital del Maestro.   Santana told Micheo that he would continue the meeting with the other Sales Department employees.

210. Micheo complied with Santana's instructions and went to Hospital del Maestro.

211. After Micheo left, Santana left with all of the members of Stericycle's Sales Department, except Micheo, to a restaurant for a farewell lunch for employee Jordy Torres, who would be leaving his employment with Stericycle.

212. Defendants excluded Micheo from the farewell lunch of November 22, 2013.

213. Santana purposely sent Micheo to Hospital del Maestro in order to exclude her from the farewell lunch because of his motivation to discriminate and retaliate against her.

214. Micheo found out from her fellow co-workers that the lunch had taken place and, on Monday, November 25, 2013, Micheo sent an e-mail to Bloomfield and Santana in which she complained about having been excluded from the lunch, and stated that said exclusion

was an act of retaliation.  Micheo further stated that she was not going to resign from employment and that she would continue to defend her right not to be a victim of discrimination and retaliation.

215. On December 19, 2013, defendants placed Micheo on a Performance Improvement Plan ("PIP").

216. The PIP was baseless and fraught with misrepresentations of Micheo's conduct and work performance.

217. For example, as part of the PIP, defendants made reference to an e-mail that Micheo had sent eight months earlier, on April 19, 2013, in which she responded to an e-mail sent by Santana in which he was requesting information from Micheo during non-working hours. In her e-mail, Micheo had asked that Santana not burden her with work-related matters during non-working hours.

218. After April 19, 2013, and before the PIP of December 19, 2013, Micheo had never been disciplined and/or reprimanded in any way for this e-mail.

219. Furthermore, the PIP also made reference to Micheo's alleged "aggressive and insubordinate" attitude during the staff meeting of October 4, 2013, despite the fact that Micheo had not engaged in any such "aggressive and insubordinate" behavior during the meeting, and all she had done was complain that Rodríguez' assignment to a Project Manager position and her placement as his subordinate was discriminatory and retaliatory.

220. The PIP also made reference to the situation of November 12, 2013, when Santana sent an e-mail alleging that Micheo had incurred in an expense to the company without Santana's approval, despite the fact that Micheo had expressly requested Santana's approval, and indeed, Santana approved it and, anyway, Micheo paid for the expense herself.

221. Rivera and Santana summoned Micheo to a meeting in which they demanded that she sign the PIP.

222. In the copy of the PIP which Rivera and Santana were ordering Micheo to sign, Micheo attempted to write that she did not agree with the contents of the PIP, but as soon as Micheo would start writing that she did not agree with the contents of the PIP, Rivera and Santana would take the document away from Micheo, and would destroy the document by putting it in the paper shredder.

223. Rivera and Santana would tell Micheo in a hostile and intimidating tone that she could not write what she was writing and that she "had to sign and that was it."   ("Tienes que firmar y ya.").

224. In view of defendants' order barring Micheo from expressing her disagreement in writing with the contents of the PIP, Micheo took the copy of the PIP with her, wrote that she disagreed with it, scanned it, and sent an e-mail to Bloomfield, Rivera and Santana on December 20, 2013 in which she stated that she did not agree with the PIP and that the PIP was an act of retaliation against her.   To this e-mail, she attached the copy of the PIP in which she wrote that she did not agree with its contents.

225. Defendants' placement of Micheo on an unjustified PIP was in retaliation against Micheo for having engaged in protected conduct under Title VII, ADA and FMLA.

226. On December 20, 2013, a Christmas party was being held at Stericycle's Carolina plant.

227. On that day, Santana called Micheo and told her to come to the Stericycle Carolina plant.

228. Micheo thought that she was being invited to the Christmas party.

229. However, when Micheo arrived at the Christmas party at the Stericycle Carolina plant, she realized that she had not been invited to the party, because Rivera and Santana immediately

26

told her in front of all the Stericycle employees who were present at the party: "Come with

us.   We have to talk." ("Ven con nosotros.   Tenemos que hablar.")

230. Micheo went to an office with Rivera and Santana.   At the office, Rivera and Santana told

Micheo that she was suspended from employment.

231. Micheo asked them why she was suspended.

232. Santana told Micheo that she was suspended because she did not accept the PIP.

233. Micheo's suspension would be until January 2, 2014.

234. No events had happened after Micheo was placed on a PIP the day before which warranted

any adverse action from defendants, much less Micheo's suspension.

235. By suspending Micheo from employment the day immediately after placing Micheo on the

PIP, defendants afforded Micheo no opportunity whatsoever to demonstrate to defendants

the baselessness of the PIP and/or to correct the alleged deficiencies, if any, in her work

performance.

236. Additionally, Micheo's suspension from employment was without pay.   The only reason

why Micheo was paid during the period of her suspension was because the dates during

which Micheo was to be suspended had previously been approved as vacation leave.

Therefore, the payment received by Micheo corresponded to vacation leave and not to

salary.

237. Micheo's suspension from employment without pay was in retaliation against her for

complaining of defendants' discriminatory and retaliatory conduct.

238. Micheo returned to work on January 3, 2014.

239. On that date, Rivera and Santana summoned Micheo to a meeting and once again ordered

her to sign the PIP.

240. For the second time, in the copy of the PIP which Rivera and Santana were ordering Micheo to sign, Micheo attempted to write down that she did not agree with the contents of the PIP, but as soon as Micheo would start writing that she did not agree with the contents of the PIP, Rivera and Santana would tell Micheo in a hostile and intimidating tone that she could not write what she was writing and that she "had to sign and that was it."   ("Tienes que firmar y ya.").

241. In view of the fact that defendants were refusing once again to allow Micheo to express her written disagreement with the contents of the PIP, Micheo signed the PIP but, once again, she sent an e-mail to Rivera and Santana in which she reiterated her position that the PIP was baseless. ("Sigo entendiendo que este [PIP] no está justificado.")

242. Additionally, upon returning to work on January 3, 2014, during those first weeks of January 2014, Micheo discovered that, after she had informed defendants of her hospitalizations due to her severe depression condition, she was being referred to as "the crazy one" ("la loca") at Stericycle.

243. This was part of the pervasive hostile work environment created by defendants in order to continue discriminating and retaliating against Micheo and to try to get her to resign from employment.   The reference to Micheo as "la loca" was discriminatory on account of Micheo's severe depression condition of which defendants were well aware.

244. On January 18, 2014, Micheo notified Bloomfield and Santana via e-mail that her doctor had ordered that she be hospitalized, and that she was hospitalized at the First Hospital Panamericano.   Micheo stated that the reason why she had been hospitalized was because she was suffering from panic attacks, severe depression and tension at the workplace.

245. In that same e-mail to Bloomfield and Santana of January 18, 2014, Micheo stated: "I request that these days be credited to my sick days pursuant to the Family Medical Leave Act." ("Pido que estos días se acrediten a días de enfermedad en base a la licencia Family Medical Leave Act.")

246. Micheo's e-mail of January 18, 2014 contained a valid request for leave for personal health conditions pursuant to FMLA.

247. Two days later, on January 20, 2014, while Micheo was still hospitalized, defendants terminated her from employment.

248. Micheo's termination was informed to her via a letter signed by Santana which was sent via certified mail to Micheo's residence.

249. On the same date of the termination, and while Micheo was hospitalized, defendants cancelled Micheo's health insurance plan with Stericycle.

250. There was no reason to terminate Micheo.   Indeed, she was hospitalized at the time when defendants terminated her and nothing had happened which warranted her discharge.

251. Furthermore, since defendants had placed Micheo on a PIP only a month earlier (December 19, 2013), then suspended her from employment from December 20, 2013 until January 3, 2014, and then Micheo had been hospitalized since January 18, 2014, defendants, again, did not allow Micheo any opportunity whatsoever to either demonstrate the baselessness of the PIP and/or to improve any alleged work performance deficiencies.

252. Micheo's termination from employment was without just cause in violation of Law No. 80 and in retaliation against her for engaging in protected conduct under Title VII, ADA and Puerto Rico Laws Nos. 44, 69 and 115, as well as in retaliation for requesting leave under

FMLA.  Indeed, Micheo had made a valid FMLA request a mere two days before her termination.

253. Micheo's termination was also discriminatory on account of her disability.  Defendants were aware of Micheo's severe depression condition and that she was hospitalized for said condition at the time of her termination.

254. Micheo had informed defendants two days before her termination that she was hospitalized and requested leave under FMLA.   Defendants had an obligation under FMLA to continue Micheo's health insurance because she was receiving medical care for personal health reasons.   Defendants violated their obligations towards Micheo under FMLA.

255. As a result of defendants' discriminatory and retaliatory conduct, Micheo has suffered severe emotional and economic damages.

256. Defendants are jointly and severally liable for all of the damages caused to Micheo as a result of the discriminatory and retaliatory conduct related herein.

257. On January 28, 2014, Micheo filed a second charge of retaliation against defendants before the EEOC.

258. On November 19, 2014, the EEOC issued its Notice of Right to Sue as to Micheo's charge number 515-2014-00345, and on December 10, 2014, it issued the same as to Micheo's charge number 16H-2014-00105C.

## IV. FIRST CAUSE OF ACTION (Gender Discrimination Under Title VII)

259. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

260. Defendants' conduct constitutes discrimination against Micheo on account of her gender.

261. Micheo has suffered severe economic and emotional damages as a result of defendants' discrimination on account of her gender.

262. Defendants' conduct constitutes discrimination against Micheo in violation of Title VII's and the Civil Rights Act of 1991's mandate to eradicate from the workplace any type of discrimination on the basis of sex.  Stericycle is liable to Micheo for all backpay, economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' discriminatory conduct.

263. As a result of defendants' discrimination against Micheo, she is also entitled to injunctive relief in the form of an order to Stericycle to cease and desist of any further discriminatory treatment against Micheo.

### V. SECOND CAUSE OF ACTION (Punitive Damages for Gender Discrimination)

264. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

265. Defendants' discriminatory practices against Micheo were malicious and/or carried out with reckless indifference to her federally protected right to be free from discrimination.

266. Micheo has suffered severe economic and emotional damages as a result of defendants' malicious and/or reckless discriminatory conduct.

267. As a result, Stericycle is liable to Micheo for punitive damages.

### VI. THIRD CAUSE OF ACTION (Gender Discrimination Under Laws No. 69 and 100)

268. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

269. Defendants' conduct constitutes a violation of Local Laws No. 100 of June 30, 1959, as amended, and Law No. 69, of July 6 1985, which prohibit discrimination in the workplace on the basis of gender.

270. Micheo has suffered severe economic and emotional damages as a result of defendants' discrimination on account of her gender.

271. As a result of defendants' discriminatory conduct, Micheo has suffered damages for which defendants are fully liable.   Under the above cited statutes, defendants are liable for double the backpay, economic, emotional and special damages and continuous loss of income suffered by Micheo as a result of defendants' unlawful conduct.

## VII. FOURTH CAUSE OF ACTION (Retaliation Under Title VII)

272. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

273. Micheo engaged in protected conduct under Title VII's anti-retaliation provisions when she complained about defendants' discrimination on the basis of her gender.

274. Defendants retaliated against Micheo in response to Micheo's decision to exercise her right under Title VII to complain of defendants' discriminatory conduct.

275. Micheo has suffered severe economic and emotional damages as a result of defendants' retaliation.

276. Stericycle is liable to Micheo for all backpay, economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' retaliatory conduct.

## VIII. FIFTH CAUSE OF ACTION (Punitive damages for Retaliation Under Title VII)

277. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

278. Defendants' actions were malicious and/or in reckless disregard for Micheo's federally protected rights for engaging in a protected activity when she complained of defendants' gender-based discrimination.

279. Micheo has suffered severe economic and emotional damages as a result of defendants' malicious and/or reckless violation of her federally protected rights.

280. As a result, Stericycle is liable to Micheo for punitive damages under Title VII for defendants' retaliatory conduct.

## IX. SIXTH CAUSE OF ACTION (Disability Discrimination under ADA and ADAAA)

281. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

282. Micheo was discriminated against by defendants on the basis of her disability.

283. Micheo has suffered severe economic and emotional damages as a result of defendants' discrimination on account of her disability.

284. Defendants' conduct constitutes a violation of the ADA and the ADAAA.

285. As a result of defendants' discriminatory practices, Micheo was unlawfully deprived of her salary and principal means of livelihood.

286. Micheo is entitled to the backpay to which she would have been entitled if she had not been discharged, plus any increases to which she would have been entitled.

287. Micheo is also entitled to backpay, economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' discriminatory conduct, in violation of the ADA and the ADAAA.

288. As a result of defendants' discriminatory conduct, Micheo is also entitled to injunctive relief in the form of reinstatement and an order against defendants to cease and desist of any further discriminatory and retaliatory conduct against Micheo.

289. Micheo is also entitled to front pay in *lieu* of reinstatement.

## X. SEVENTH CAUSE OF ACTION (Punitive Damages for Disability Discrimination)

290. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

291. Defendants' discriminatory practices against Micheo were malicious and/or carried out with reckless indifference towards Micheo's federally protected rights.

292. Defendants knew or should have known that their conduct towards Micheo contravened the ADA and the ADAAA.

293. Micheo has suffered severe economic and emotional damages as a result of the malicious and/or reckless violation of her federally protected rights.

294. Micheo is entitled to punitive damages as a result of defendants' discriminatory conduct on account of her disability.

## XI. EIGHTH CAUSE OF ACTION (Disability Discrimination under Law No. 44 and 53)

295. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

296. Defendants' conduct constitutes discrimination on the basis of disability under Puerto Rico Laws Nos. 44 and 53.

297. Micheo has suffered severe economic and emotional damages as a result of defendants' discrimination on account of her disability.

298. Stericycle is liable to Micheo for double the backpay, economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' discriminatory conduct on the basis of disability.

### XII. NINTH CAUSE OF ACTION (Retaliation under ADA, ADAA and Law No. 44)

299. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

300. Micheo engaged in protected conduct under ADA, ADAAA and Law No. 44, and as a result of the assertion of her rights to work free of discrimination on account of her disability, she suffered a slew of adverse employment actions.

301. Micheo has suffered severe economic and emotional damages as a result of defendants' retaliation against her.

302. As a result of defendants' retaliatory conduct, Micheo is entitled to the back pay to which she would have been entitled absent disability discrimination and retaliation as well as to an award of economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' retaliatory conduct.

303. As a result of defendants' retaliatory conduct, Micheo is also entitled to injunctive relief in the form of reinstatement and an order against defendants to cease and desist of any further retaliatory treatment against her and/or front pay *in lieu* of reinstatement.

### XIII. TENTH CAUSE OF ACTION (Punitive damages for Retaliation Under ADA and ADAAA)

304. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

305. Defendants' retaliatory practices against Micheo were malicious and/or carried out with reckless indifference towards Micheo's federally protected rights.

35

306. Micheo has suffered severe economic and emotional damages as a result of the malicious and/or reckless violation of her federally protected rights.

307. Defendants knew or should have known that their conduct towards Micheo contravened the federal and local anti-retaliation provisions.

308. Micheo is entitled to punitive damages as a result of defendants' retaliatory conduct.

### XIV. ELEVENTH CAUSE OF ACTION (Retaliation Under Law No. 115)

309. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

310. Micheo engaged in "protected conduct" under Law No. 115.

311. As a result of engaging in protected conduct, defendants retaliated against Micheo in violation of Law No. 115.

312. Micheo has suffered severe emotional and economic damages as a result of defendants' retaliation against her.

313. Defendants are liable to Micheo for double the backpay, economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' discriminatory conduct, together with an award of costs and attorneys' fees.

### XV. TWELFTH CAUSE OF ACTION (Family Medical Leave Act)

314. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

315. Micheo requested leave for personal health conditions under FMLA.

316. Defendants interfered with Micheo's rights under FMLA and retaliated against her for requesting FMLA leave.

36

317. Defendants cancelled Micheo's health insurance plan when Micheo requested leave under FMLA, in violation of FMLA.

318. Under FMLA, Stericycle is liable to Micheo for lost pay and benefits, plus interests calculated at the prevailing rate.

319. Under FMLA, Micheo is also entitled to receive from Stericycle twice the amount claimed in the preceding paragraphs as a penalty because there was a willful violation of the law.

320. Pursuant to FMLA, Micheo is entitled to reinstatement plus a reasonable amount in attorneys' fees, reasonable expert witness fees, and costs.

### XVI. THIRTEENTH CAUSE OF ACTION (Wrongful Discharge Under Law No. 80)

321. Micheo repeats and incorporates by reference each and every preceding allegation as if fully set herein.

322. Micheo was discharged without just cause by Stericycle, in violation of Law No. 80.

323. As a result of Micheo's unjust discharge, she is entitled to indemnity under Law No. 80.

### XVII. DEMAND FOR JURY TRIAL

324. Micheo hereby demands that all of her causes of action be tried before a jury.

**WHEREFORE**, all premises considered, Micheo prays from this Honorable Court the following relief:

1.   An order directing defendants to cease and desist of any further discriminatory and/or retaliatory conduct against Micheo;

2.   Lost benefits, both past and future;

3.   An award of compensatory damages in an amount not less than $4,000,000.00;

4.     Double compensatory, emotional and economic damages under Laws Nos. 44, 53, 69, 100, and 115;

5.     An award of punitive damages in an amount not less than $4,000.00.00;

6.     Lost pay and benefits, plus interests at the prevailing rate, for FMLA violations;

7.     Twice the amount of lost pay and benefits due to the willful FMLA violations;

8.     Indemnity pursuant to Law No. 80 in the amount of $5,212.50, plus costs and attorneys' fees;

9.     An award of reasonable attorneys' fees, together with costs, litigation expenses and necessary disbursements;

10.     Prejudgment interests; and

11.     Any other remedies which this court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 3rd day of February, 2015.

**LAW OFFICE OF CARLOS VERGNE**
24 Mariana Bracetti St., 2nd Floor
San Juan, PR 00918
Tel. (787) 753-3799
Fax (787) 759-8429
e-mail: carlosvergne@aol.com

*S/Carlos M. Vergne Vargas*
CARLOS M. VERGNE
USDCPR No. 209611

**GONZÁLEZ MUÑOZ LAW OFFICES, PSC**
P.O. Box 9024055
San Juan, PR 00902-4055
Tel. (787) 766-5052
Fax (787) 766-5551
e-mail: polonorteprlaw@gmail.com,
jrgmlaw@gmail.com

*s/Juan Rafael González Muñoz*
JUAN RAFAEL GONZÁLEZ MUÑOZ
USDCPR No. 202312