IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

MARISOL MICHEO-ACEVEDO,

    **Plaintiff,**

        v.                            CIVIL NO. 15-1097 (JAG)

STERICYCLE OF PUERTO RICO, INC.,

    **Defendant.**

## OPINION AND ORDER

GARCIA-GREGORY, D.J.

    Plaintiff Marisol Micheo-Acevedo ("Ms. Micheo") brought suit against Stericycle of Puerto Rico, Inc. ("Stericycle") alleging that Stericycle discriminated against her on the basis of sex, disability, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Americans with Disabilities Act, as amended, 48 U.S.C. §§ 12101 *et seq.* ("ADA"); and interference with rights and retaliation under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54 ("FMLA"). Ms. Micheo also seeks supplemental jurisdiction alleging discrimination and retaliation pursuant to Puerto Rico Law 100 of June 30, 1959, P.R. Laws Ann., tit. 29, § 146 *et seq.* ("Law 100"); Puerto Rico Law 69 of July 6, 1985, P.R. Laws Ann., tit. 29, § 1321 *et seq.* ("Law 69"); Puerto Rico Law 44 of July 2, 1985, P.R. Laws Ann. tit. 1, §§ 501 *et seq.* ("Law 44"); Puerto Rico Law 53 of August 30, 1992, P.R. Laws Ann. tit. 1, § 511 *et seq.* ("Law 53"); and Puerto Rico Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194 *et seq.* ("Law 115"); and Puerto Rico Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185(a) *et seq.* ("Law 80").

Before the Court is Stericycle's Motion for Summary Judgment (the "Motion"). Docket No. 81. Having considered the Motion, Ms. Micheo's opposition, Docket No. 99, and Stericycle's reply, Docket No. 106, the Court **GRANTS** Stericycle's Motion.

## BACKGROUND[1]

Uncontested Facts[2]

Ms. Micheo worked for Stericycle as a Field Sales Representative from April 15, 2012 until the termination of her employment on January 20, 2014. Docket No. 106-1 at 124. Stericycle is a subsidiary of Stericycle, Inc., a global company that provides specialized solutions to healthcare organizations such as hospitals. *Id.* at 125. Stericycle's services involve managing regulated medical waste, including biohazardous waste, unused pharmaceuticals, sharps, and pathological waste. *Id.* To manage its employees, Stericycle has a Team Member Handbook (the "Handbook") that applied to Ms. Micheo when she was employed at Stericycle. *Id.* at 126. Ms. Micheo acknowledged receipt of this Handbook. *Id.*

---

[1] In replying to Stericycle's Statement of Uncontested Material Facts ("SUMF"), Ms. Micheo at times summarily denies certain uncontested facts as unsupported by the record without providing a specific citation as required by Local Civ. R. 56(c). *See, e.g.*, Docket No. 106-1 at 137, 138. However, upon close inspection of the record, many of the facts appear to be supported by depositions and other factual evidence. Thus, the Court will deem as "uncontested" any fact that is properly supported by the record and that is not properly contested. *See Martinez-Rodriguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010) (A party opposing summary judgment is required to "present definite, competent evidence to rebut the motion.") (quoting *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008)).

[2] To be uniform, the Court will borrow the facts, the reply to the facts, Ms. Micheo's extra facts, and the reply to those, from Stericycle's Reply to Plaintiff's Additional Relevant Facts and Opposing Statement of Material Facts, Docket No. 106-1.

The Handbook contains the Equal Employment Opportunity policy and the Affirmative Action policy that states that the company will not discriminate against employees based on "race, color, religion, sex, age, disability, veteran status, national origin, or any other characteristic protected by applicable law." Docket No. 106-1 at 128. The Handbook also contains a Personal Conduct policy that provides that Stericycle's employees cannot be offensive to other employees and must behave in manners that create efficiency to the operation of the company. *Id.* at 130. The Personal Conduct policy further states that "[f]ailure to conduct yourself in an appropriate manner can lead to corrective action up to and including termination." *Id.*

The Handbook also contains an Employee Correction Action policy, which states that the company may take progressive steps to discipline employees such as a verbal notice, first written notice, second written notice, final written notice/suspension, and/or termination. Docket No. 106-1 at 131. This policy further provides that the company reserves the right to "skip steps" in the disciplinary process and may utilize a "performance plan" in lieu of any step. *Id.* at 132.

Osvaldo Santana Rivera ("Mr. Santana") was the Sales Manager and Ms. Micheo's direct supervisor when she started working at Stericycle. Docket No. 106-1 at 134. In that role, Mr. Santana supervised other sales representatives including Jorge Rodriguez Toro ("Mr. Rodriguez"), Jordy Torres ("Mr. Torres"), Lennice Bermudez ("Ms. Bermudez"), and Christian Figueroa ("Mr. Figueroa"). *Id.* Throughout her entire employment at Stericycle, Ms. Micheo's official job position was that of a Field Sales Representative with a paid annual rate of $27,000. *Id.*

Civil No. 15-1097 (JAG)                                                                                    4

In or around March 2013, Stericycle launched a program called BioSystem, which Mr. Santana oversaw. Docket Nos. 106 at 136; and 81-9 at 8.[3] The BioSystem program had different initiatives including the Integrated Waste Stream Solutions ("IWSS") and the Sharps Management System ("SMS") programs. *Id.* at 137. As part of the BioSystem program, Stericycle engaged in contracts with hospitals and installed containers to dispose of sharp, biomedical objects such as needles and syringes. *Id.* Installation of these boxes was performed by contractors, but supervised by Stericycle team members, which included sales representatives. *Id.*

When implementing the new BioSystem program, Stericycle recycled its sales representatives and assigned them duties solely within the BioSystem program. Docket No. 106-1 at 138. At the beginning of the program, employees did not have specific duties; rather "everybody had to cover, everybody had to be doing different duties."[4] *Id.* at 140. The sales representatives were instructed to help with hospital installations, overseeing contractors, and ensuring projects were accomplished according to the program's plan while still meeting their sales quotas. *Id.* at 138. Sales representatives assigned to the BioSystem program were also required to send paperwork about the program to Mr. Santana for his approval. *Id.* To manage BioSystem's scarce human resources, Mr. Santana requested that all sales representatives create and forward proposed weekly calendars to him. *Id.* at 140.

---

[3] Although Ms. Micheo attempts to create confusion regarding the work titles, and whether Mr. Rodriguez was indeed BioSystem's "Program Manager." However, as explained below, it is uncontroverted that Mr. Santana was the director of the BioSystem program.

[4] Ms. Micheo does not put forth enough facts to state that she and Mr. Rodriguez were the only ones who could perform duties in the BioSystem program.

Given a series of employee inquiries, Angel Rivera Morales ("Mr. Rivera"), Stericycle's General Manager, decided that a BioSystem Program Manager position ("Program Manager") could not be established unless Stericycle secured more hospitals to justify the position. Docket No. 106-1 at 141-42. In addition, Mr. Rivera also decided that a supervisory position within the BioSystem program could not be authorized until the program would grow.[5] *Id.* Accordingly, Stericycle never created, nor did a person occupy, the position of "Program Manager" within the BioSystem program. *Id.* at 144.

For reasons unbeknownst to the company, at certain points during the course of his employment at Stericycle, Mr. Rodriguez would hold himself out to be the "IWSS Program Manager." Docket No. 106-1 at 144. Similarly, Ms. Micheo held herself to be the "SMS Supervisor."[6] *Id.* They never received additional compensation to accompany these titles.[7] *Id.*

In April 2013, Ms. Micheo was transferred to the supervision of Antonio Gonzalez Aguiar ("Mr. Gonzalez"), the Director of Operations at Stericycle. Docket No. 106-1 at 145. Under Mr. Gonzalez's supervision, Ms. Micheo was removed from her sales duties but continued working

---

[5] Ms. Micheo strenuously argues that Mr. Santana told Mr. Rodriguez that he was going to be "Program Manager" and that his duties were going to be that of a "Program Manager." Docket No. 97-4 at 9, 67. However, other than Mr. Rodriguez's hearsay comments that he was going to be "Program Manager" and his self-proclaimed appointment in his emails, there is no evidence that the "Program Manager" position was actually created. Thus, without more, we cannot deem this fact as disputed. *See Martinez-Rodriguez*, 597 F.3d at 419 (A party opposing summary judgment is required to "present definite, competent evidence to rebut the motion.") (quoting *Vineberg*, 548 F.3d at 56).

[6] After he was transferred back to sales, Mr. Rodriguez would electronically sign his emails with the "Pr. Mgr." abbreviation.

[7] Although they were not official titles, both employees were responsible for those initiatives within the BioSystem program.

on the BioSystem program. *Id.* at 146. Ms. Micheo received training opportunities with Mr. Gonzalez. *Id.* at 148.

In September 2013, Ms. Micheo was transferred back to sales under Mr. Santana's supervision. Docket No. 106-1 at 146. Mr. Rivera stated in his sworn affidavit that the reason to move Ms. Micheo was predicated on his business judgment that the departments needed to merge. *Id.* During that month after Ms. Micheo was transferred back, Mr. Santana gave Ms. Micheo specific assignments in a detailed memorandum with respect to the SMS Program. *Id.* at 147. In essence, the memorandum said that she was going to be the point person in charge of the SMS initiative at the hospitals and that she needed to maintain him appraised of what was happening at the hospitals regarding SMS. *Id.* Mr. Santana also asked Ms. Micheo for assistance in conducting interviews of technician candidates for the BioSystem program and reviewing payroll. *Id.* Ms. Micheo requested that Mr. Santana lower her sales quota to 50% or her original monthly goal, while she performed these duties for the BioSystem program. *Id.* at 148.

In 2012, Mr. Rodriguez began his employment with Stericycle as a Field Sales Representative earning $27,000 a year. Docket No. 106-1 at 149. Sometime in 2013, Mr. Rodriguez was promoted to Transportation Supervisor and received a corresponding 10% salary increase, for a total of $29,700. *Id.* at 150. Mr. Rodriguez was qualified for this positon because he had worked for an Army motor pool in the past. *Id.* at 151. In late September or early October of 2013, Mr. Rodriguez was transferred back to the sales department. Docket No. 81-12 at 19. In addition to his sales representative responsibilities, Mr. Rodriguez was given additional duties involving the BioSystem program. Docket No. 106-1 at 152. Mr. Rodriguez was never paid additional

compensation for the duties performed for the BioSystem program. *Id.* After some adjustments, Mr. Rodriguez kept his Transportation Supervisor salary when he was transferred back to the sales department. *Id.*; Docket No. 81-12 at 18-19. Mr. Rodriguez was never assigned to supervise Ms. Micheo when he went back to the sales department.[8] Docket No. 106-1 at 153.

Ms. Micheo alleges that he met with Mr. Santana various times and told him that Mr. Santana was treating her differently than he treated other co-workers. Docket No. 106-1 at 155. On April 15, 2013, Ms. Micheo sent a written memorandum ("April memo") to Stericycle's Human Resource Department ("HR Department") via email to Ms. Monica Bloomfield ("Ms. Bloomfield"), Stericycle's Human Resource manager. *Id.* at 144, 155. The April memo did not make explicit any allegations of gender or disability discrimination. *Id.* at 156. Nonetheless, Ms. Bloomfield referred the memo to her supervisor Mary Belen (Ms. Belen), the Human Resource director. *Id.* Ms. Bloomfield did not share the contents of the April memo with anyone except Ms. Belen. *Id.*

On October 4, 2013, at a sales department meeting, Ms. Micheo challenged a management decision regarding the organizational structure of the company. *Id.* at 165. Mr. Rivera and Mr. Santana were both present at the meeting and gave Ms. Micheo a written memorandum because they found her behavior to be insubordinate. *Id.*

---

[8] Ms. Micheo heavily contests this point. Docket No. 106-1 at 153-54. She argues that, because Mr. Rodriguez held himself out to be the "Program Manager" for the BioSystem program, was once assigned to follow up on a hospital visit that Ms. Micheo had not performed, then Mr. Rodriguez was acting like Ms. Micheo's supervisor. However, Ms. Micheo does not put forth sufficient facts to create a genuine dispute of material fact as to this issue.

On or around October 7, 2013, Mr. Santana was informed that the Puerto Rico Department of Health was conducting an inspection at Hospital San Lucas Guayama and required information about the SMS program. Docket No. 106-1 at 168. Mr. Santana, after reviewing Ms. Micheo's calendar, saw that she was scheduled to be in that hospital on that day. *Id.* When Mr. Santana called Ms. Micheo to instruct her to help with the agency's inquiries, she told him she was at home and had not conducted any hospital visits that day. *Id.*

On October 25, 2013, Mr. Santana and Mr. Rodriguez received emails from Mr. Torres and Mr. Figueroa, two sales representatives under Mr. Santana's supervision, regarding hospital visits they were covering for Ms. Micheo when she was absent from the office. Docket No. 106-1 at 170. The emails listed several issues that Ms. Micheo was supposed to address, but that remained unresolved at the hospitals. *Id.* Some of the issues involved sharp containers that needed to be changed, maintenance issues, a complaint regarding Ms. Micheo's defective supervision, and inconsistent communication with the Cardiovascular Hospital. *Id.* Mr. Rodriguez met with Ms. Micheo and sent her a follow up email regarding these issues. *Id.*

On October 28, 2013, Mr. Rodriguez and Mr. Santana received another email from Mr. Figueroa regarding a recent visit to the Cardiovascular Hospital. Docket No. 106-1 at 173. Mr. Figueroa's email explained that he had received a complaint from hospital staff regarding Ms. Micheo's lack of supervision over technicians at the hospital. *Id.*

On October 29, 2013, Mr. Rodriguez sent Ms. Micheo an email advising her that she should spend time in the office finishing the assignments listed in the email. Docket No 106-1 at 175. The next day, Mr. Rodriguez sent a follow up email to Ms. Micheo stating that it was 10:00 a.m. and she had not yet reported to work. *Id.* In a follow up email, Ms. Micheo indicated that Mr.

Rodriguez only suggested that she should come to work and that she had been working since 4:30 a.m. on the assigned list. *Id.* Ms. Micheo further stated that this was an act of reprisal because he knew she was going to sue him and the company. *Id.*

On November 4, 2013, around 11:00 a.m., Mr. Santana personally observed that Ms. Micheo had not yet arrived to work. Docket No. 106-1 at 176. When Mr. Santana called Ms. Micheo, she told him that she was still at home. *Id.* Mr. Santana observed in her calendar that she was supposed to be at the Mayaguez Hospital at the time of the call. *Id.* Ms. Micheo argued in the phone call that she was doing payroll work all morning. *Id.* Mr. Santana reminded her that she needed to be at work as agreed in a October 31, 2013 meeting. *Id.* Ms. Micheo later emailed Mr. Santana and stated that she could not go to a later appointment at the Manati Hospital to drop off some supplies that the hospital had needed for about a week because Mr. Santana had ordered her to report to work immediately. Docket No. 105-17. Mr. Santana responded that he called because they had previously agreed that she was going to finish her work at Stericycle's Main office in San Juan. *Id.* Mr. Santana also remarked that she had changed her calendar entries without consulting him first. *Id.*

On November 12, 2013, Mr. Santana admonished Ms. Micheo via email for ordering and approving payment of labels for sharp containers, which incurred an additional expense for Stericycle. Docket No. 106-1 at 177. In the email, Mr. Santana remarked that he had previously instructed Ms. Micheo not to use these labels. *Id.* Ms. Micheo responded by stating that her initiative was a good one and that, in any event, she would pay for the additional labels from her salary. Docket No. 81-39.

Civil No. 15-1097 (JAG)                                                                10

On November 8, 2013, Ms. Micheo filed a discrimination complaint with Puerto Rico's Anti-Discrimination Unit ("ADU/EEOC"). Docket No. 81-38. In the ADU/EEOC complaint, Ms. Micheo alleges she was discriminated based on her gender and disability. *Id.*

On November 14, 2013, there was an issue with a change of schedule. Docket No. 106-1 at 178. Ms. Micheo called Mr. Figueroa to see if he could ask Mr. Santana to change her schedule so that Mr. Figueroa could cover her hospital visit. *Id.* Mr. Figueroa sent an email to Mr. Santana relaying the message. *Id.* Mr. Santana responded that all changes in the schedule need to go through him and that this run around was proof of Ms. Micheo's insubordination. Docket No. 81-40.

On November 20, 2013, Ms. Micheo requested access to Mr. Santana's work calendar. Docket No. 106-1 at 180. In her deposition, Ms. Micheo denied it at first but then explained that she thought she was giving Mr. Santana access to her calendar. Docket No. 97-14.

On November 20, 2013, Mr. Rodriguez requested some work-related information from Ms. Micheo. Docket No. 106-1 at 181. Ms. Micheo replied that she had given the information to Mr. Santana and that he should ask him. *Id.* Mr. Rodriguez relayed Ms. Micheo's message to Mr. Santana. *Id.* Mr. Santana sent an email to Ms. Micheo telling her that she was not being a team player and encouraged her to work with others as a team. *Id.* Ms. Micheo responded that she was following instructions that all the communications were to be channeled through Mr. Santana. *Id.*

In his deposition, Mr. Rodriguez testified that he received multiple complaints from hospitals that participated in the SMS program, which was led by Ms. Micheo. Docket No. 106-1 at 184.

On November 25, 2013, Ms. Micheo emailed Mr. Santana and accused him of humiliating her by excluding her from Mr. Torres's "farewell" lunch. *Id.* at 186. Mr. Santana replied that she again had reached a wrong conclusion and it was simply lunch after a routine four-hour meeting, and was not supposed to be a "Thanksgiving dinner."[9] *Id.* Mr. Santana also stated that this accusatory email was proof of her insubordination and lack of ethics. Docket No. 81-44.

On or around November 19 2013, Mr. Santana and Mr. Rivera met with Ms. Bloomfield and Armando Herrera, the senior HR manager at the time, to discuss Ms. Micheo's performance problems. Docket No. 106-1 at 187.   In conjunction with that meeting, Mr. Rivera and Ms. Bloomfield decided that Ms. Micheo should be placed in a Performance Improvement Plan ("PIP"). *Id.* at 188.

On or around December 19, 2013, Mr. Santana and Mr. Rivera met with Ms. Micheo to discuss the PIP. Docket No. 106-1 at 190. At this meeting, Ms. Micheo did not sign the PIP.  *Id.* Mr. Santana and Mr. Rivera informed Ms. Bloomfield that Ms. Micheo had not signed the PIP. *Id.* As a result, she was suspended from December 23, 2013 until January 2, 2014. *Id.* at 191. Ms. Micheo signed the PIP on January 3, 2014. *Id.* at 193. The PIP provided a list of items she needed to improve on by the end of January 2014. *Id.* at 194. The PIP further stated that failure to improve or maintain a satisfactory performance could result in termination. *Id.*

On January 16, 2014, Mr. Santana received a verbal complaint from Carlos Remesal ("Mr. Remesal"), the head of a company contracted by Stericycle to perform an installation at Santa

---

[9] The Court is not familiar with the saying, but takes it to mean to invite all the co-workers to lunch.

Rosa I and II Hospitals in the Municipality of Guayama. Docket No. 106 at 195. Mr. Remesal informed Mr. Santana that Ms. Micheo had arrived three hours later than scheduled then left after thirty minutes. *Id.* at 196. When Mr. Santana called Ms. Micheo that day, she told him that she was on her way to a doctor's appointment. *Id.* at 196-97. Mr. Santana instructed Ms. Micheo to return to the hospital after her appointment because she was needed there. *Id.* at 197. Ms. Micheo returned to the hospital at 3:00 p.m. *Id.* at 198. Mr. Santana emailed Ms. Bloomfield about this incident. *Id.* at 197. Mr. Santana also received a written complaint from Mr. Remesal. *Id.* at 198. In a sworn affidavit, Ms. Micheo stated that the reason for her tardiness was that her car had broken down. *Id.*

The following day, Mr. Santana met with Ms. Micheo, with Ms. Bloomfield joining via telephone conference, to discuss the incident at the Santa Rosa Hospitals. Docket No. 106-1 at 199. In the meeting, Ms. Micheo failed to deny that she did not notify Stericycle that she was going to leave the hospital to go to the doctor. *Id.*

On January 17, 2013, Mr. Rivera and Ms. Bloomfield discussed Ms. Micheo's various performance deficiencies and decided to terminate her from employment with Stericycle because of her "repeated violations of Stericycle policy, demonstrations of inappropriate and insubordinate conduct, negligent performance of her job functions, and violation of the PIP." Docket No. 106-1 at 201. That same day, Ms. Bloomfield met with Mr. Herrera and received his approval to proceed with the termination. *Id.* In addition, later during that day, Ms. Bloomfield contacted and informed Stericycle's counsel that there was sufficient cause to terminate Ms. Micheo. *Id.* at 202. Ms. Micheo's termination was effective January 20, 2014. *Id.*

<u>Contested Facts</u>

Ms. Micheo argues that there was a supervisory guide to disciplining employees and that, according to that guide, Ms. Micheo was not properly disciplined. Docket No. 106-1 at 131-32. She claims that she has never seen the job duties described by Mr. Santana on his deposition. Docket No. 81-9 17-18. Ms. Micheo argues that, after she was brought back to sales, she was given the title of "SMS supervisor" and that Mr. Rodriguez was given the title of "IWSS Supervisor." *Id.* at 139. Ms. Micheo also claims that in the October 4, 2013 meeting she did not aggressively challenge management decisions. *Id.* at 165. Ms. Micheo claims that she did not receive a copy of the October 7, 2013 written memo and that Mr. Santana never verbally warned her on October 28, 2013. *Id.* at 168, 174. Finally, Ms. Micheo argues that she did not refuse to sign the PIP, but that she wanted time to read it. *Id.* at 190.

Stericycle argues that the supervisory guide referenced by Ms. Micheo is not mandatory, but an advisory guideline. Docket No. 106-1 at 132. Mr. Santana claims that at all times during his employment the job duties described at Docket No. 81-21, were the job duties of a Field Sales Representatives. Docket No. 106-1 at 136. Stericycle argues that the titles of "SMS supervisor" and "IWSS Supervisor" were self-proclaimed by Ms. Micheo and Mr. Rodriguez respectively. *Id.* at 144. Stericycle claims that Ms. Micheo had an outburst when she aggressively criticized a management decision in a October 4, 2013 meeting. *Id.* at 167. Stericycle argues that Mr. Santana notified her of the October 7, 2013 written memo and of the verbal notice of October 28, 2013. *Id.* at 169-70, 174-75. Finally, Stericycle claims that Ms. Micheo did not want to sign the PIP as she deemed it an act of retaliation against her. *Id.* at 190-91.

## STANDARD OF REVIEW

A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is in genuine dispute if it could be resolved in favor of either party, and it is material if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party . . . ." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citing *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). The nonmovant must demonstrate "through submissions of evidentiary quality[] that a trial worthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (internal citations omitted). In evaluating a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). It is important to note that, throughout this process, courts cannot make credibility determinations or weigh the evidence, as these are jury functions and not those of a judge. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Issues are not suitable for summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Martinez-Burgos v. Guayama Corp.*, 656 F.3d 7, 11 (2011) (quoting *Liberty Lobby*, 477 U.S. at 248). "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252). A party opposing summary judgment is required to "present definite, competent evidence to rebut the motion." *Martinez-Rodriguez*, 597 F.3d at 419 (quoting *Vineberg*, 548 F.3d at 56).

## ANALYSIS

As a preliminary matter, Ms. Micheo concedes her ADA, ADA Retaliation, FMLA, Law 53, and Law 44 claims. Docket No. 99 at 4. Thus, the Court dismisses those claims *with prejudice*. Accordingly, the Court focuses on the Title VII sex discrimination and retaliation claims, and the surviving state law claims.

### I.    Title VII of the Civil Rights Act of 1964

Title VII prohibits sex discrimination and provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting 42 U.S.C. § 2000e–2(a)(1)).

A plaintiff can prove sex discrimination in the employment context either by direct or circumstantial evidence. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335 (1st Cir.

2005). Because Ms. Micheo has not put forth any direct evidence of gender discrimination, the *McDonnell Douglas* burden-shifting framework governs her claim. *See Lockridge v. The Univ. Of Maine Sys.*, 597 F.3d 464, 470 (1st Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)).

Under this burden-shifting framework, a plaintiff-employee must first establish a *prima facie* case of gender discrimination. *Kosereis v. Rhode Island*, 331 F.3d 207, 212 (1st Cir. 2003). If the employee establishes a *prima facie* case, "the burden of production—but not the burden of persuasion—shifts to the [defendant-]employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action." *Lockridge*, 597 F.3d at 470 (citing *Garcia v. Bristol–Myers Squibb Co.*, 535 F.3d 23, 31 n.2 (1st Cir. 2008)). If the defendant-employer provides a legitimate, non-discriminatory reason for its adverse action, the burden shifts back to the employee, who must then show, by a preponderance of the evidence, that the defendant-employer's stated reason is pretextual and that the actual reason for the adverse action is discriminatory. *Smith v. Stratus Computer*, 40 F.3d 11, 16 (1st Cir. 1994).

Here, Ms. Micheo fails in every step of the *McDonnell Douglas* analysis. First, Ms. Micheo does not adequately establish a *prima facie* case of gender discrimination. Second, even if she had established a *prima facie* case, Ms. Micheo failed to show that Stericycle's non-discriminatory reason was a pretext. The Court explains its reasoning below.

A.  **Prima Facie Case – Sex Discrimination**

Ms. Micheo argues that she was discriminated against based on her gender as Mr. Rodriguez, a man, was promoted to "Program Manager" even though he had fewer qualifications than she did. Docket No. 99 at 27. The Court disagrees.

To establish a *prima facie* case of gender discrimination in the context of a failure to promote case, Ms. Micheo must show that "(i) she was a member of a protected class; (ii) she was qualified for the . . . position [she sought]; (iii) she was not hired despite her qualifications; and (iv) the job was given to a person outside the protected group." *Keyes v. Secretary of the Navy*, 853 F.2d 1016, 1023 (1st Cir. 1988); *see also Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001).

Ms. Micheo and Stericycle do not argue over the first prong. Thus, the first prong is established. However, the parties argue about every other prong.

Ms. Micheo claims that Stericycle discriminatorily promoted Mr. Rodriguez to the position of "Program Manager" over Ms. Micheo and given a corresponding salary increase. Docket No. 99 at 27. Ms. Micheo argues that she was the most qualified person for that position. *Id.* Finally, Ms. Micheo claims that Mr. Rodriguez was treated more favorably than her. *Id.*

Stericycle contends that Ms. Micheo never experienced an adverse employment action because the "Project Manager" job never existed. Docket No. 81-2 at 4. According to Stericycle, this position was never created in the BioSystem program. *Id.* Stericycle also argues that Mr. Rodriguez did not receive a pay increase when he was transferred back to the BioSystem Program. *Id.* at 5. Since the position did not exist, Ms. Micheo could not be promoted to this position and, thus, no adverse employment action took place. *Id.* at 4. The Court agrees.

An adverse action requires a material change in the conditions of employment. *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 394 (D.P.R. 2015) (explaining an adverse action in the context of the ADA). Failing to promote an employee to a position that does not exist is not enough to establish an adverse action against an employee. *See Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (finding that an adverse employment action "typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." (internal quotations marks omitted)).

Here, Ms. Micheo did not suffer an adverse employment action by Stericycle. The record shows that there was no "Program Manager" position within the BioSystem program. Docket Nos. 81-16 at 2. On or around October 2013, Mr. Santana, BioSystem's director at the time, told Mr. Rodriguez he was bringing him back to "sales" in the BioSystem program. Docket No. 97-4 at 24. Ms. Bloomfield, Stericycle's human resources manager, stated in a sworn affidavit that based on her personal knowledge as a HR manager and her review of Stericycle's payroll records, Mr. Rodriguez was never "Program Manager," because Stericycle never established that position. Docket No. 81-15 at 3. Moreover, Mr. Rivera, Stericycle's general manager in Puerto Rico, acknowledges that this position was never opened. Docket No. 81-16 at 2.[10] Thus, the Court finds that there was no "Program Manager" position, and that Stericycle did not take an adverse employment action against Ms. Micheo. *See Lowe v. City of Monrovia*, 775 F.2d 998, 1012 (9th Cir.

---

[10] Mr. Rivera explains in his sworn affidavit that the reason he decided not to open the "Program Manager" positions is that the Bio System program needed more hospitals to sign up in order to justify the corresponding position and pay. Docket No. 81-16 at 2.

1985), *amended*, 784 F.2d 1407 (9th Cir. 1986) (finding that plaintiff did not establish a *prima facie* case for discrimination because there were no job openings at the time she was eligible to be hired as a police officer).

The fact that Ms. Micheo claims that Mr. Rodriguez was supervising her and that he held himself to be the "Program Manager" does not create that position for two reasons. Docket No. 99 at 6. First, the record does not show that Mr. Rodriguez was Ms. Micheo's supervisor. Mr. Rodriguez clearly stated that he was not assigned to supervise Ms. Micheo. Docket No. 81-12 at 6. Although Mr. Santana told Mr. Rodriguez that he was going to have the "duties" of a "Program Manager," he did not say that he was going to have the position. *Id.* Indeed, Mr. Santana stated in his deposition that Mr. Rodriguez never held the position of "Program Manager." Docket No. 81-9 at 8.

Nor did Mr. Santana ever assign Mr. Rodriguez to directly supervise Ms. Micheo. Docket No. 81-12 at 6. Mr. Rodriguez at times was told to "verify with [Ms. Micheo] how it went in [a specific hospital]." *Id.* at 7. The reason behind Mr. Santana's instruction was because Ms. Micheo was not performing her duties as directed and Mr. Rodriguez was told to follow up on her work. *Id.* at 10-11; Docket No. 97-4 at 40. In fact, Mr. Rodriguez stated in his deposition that Stericycle was receiving numerous complaints from the hospitals she was supposed to visit. *Id.* at 13. As a result, Mr. Santana had to inconvenience someone with following up on Ms. Micheo's hospital appointments. Docket No. 97-4 28-32. This is sufficient to inconvenience Ms. Micheo, but insufficient to show that Mr. Rodriguez was Ms. Micheo's supervisor. *See Burlington Indus., Inc.*, 524 U.S. at 762 (noting that "one co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another.").

Second, the fact that Mr. Rodriguez held himself out to be the "Program Manager" does not automatically create that position or bestow supervisory powers on him when no one in Stericycle thought of him as the "Program Manager." Docket Nos. 81-15 at 3; Docket No. 81-9 at 8.[11] *See Burlington Indus., Inc.*, 524 U.S. at 762 (finding that "only a supervisor, or other person acting with the authority of the company, can cause [an adverse employment action]").

As a result, the Court finds that in the context of a failure to promote claim, Ms. Micheo did not suffer an adverse employment action because the employment position she claims she was not promoted to or even offered to fill, did not exist.

Turning to the fourth prong of Ms. Micheo's *prima facie* case, "it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). Ms. Micheo has not shown that Mr. Rodriguez was treated differently. They both were sales representatives and had a role within BioSystem. Thus, Ms. Micheo has also failed to put forth enough evidence to satisfy the fourth prong of the gender discrimination *prima facie* case.

Accordingly, Ms. Micheo has not established a *prima facie* case of gender discrimination in the context of failure to promote.

---

[11] In his deposition, Mr. Rodriguez states that before he returned to the BioSystem program, Mr. Santana verbally told him that his duties were going to be that of a "Program Manager." Docket No. 81-12 at 5. However, as stated above, no position was officially given or created for Mr. Rodriguez. At any rate, the position never conferred supervisory duties over Ms. Micheo or included a pay raise. *Id.* at 6; Docket No. 81-15 at 3.

### B.  Legitimate Non-Discriminatory Reason

Alternatively, assuming that a *prima facie* case of gender discrimination had been established, Stericycle puts forth a legitimate, non-discriminatory reason as to why Stericycle did not promote Ms. Micheo or why it did not create this position.

First, as explained above, Ms. Micheo was in constant dereliction of her duties. Thus, if there would have been a position open when it came time to promote someone she may have not had the necessary qualifications.

Second, Stericycle's management decided not to create a "Program Manager" position within the BioSystem program because the program, lacked the minimum level of business to justify a manager position and its corresponding salary. Docket No. 81-16 at 2. In fact, both Mr. Rodriguez and Ms. Micheo worked with the Integrated Waste Stream Solutions and Sharp Management Systems in the BioSystem program and never received any extra pay because of the additional work. Docket Nos. 81-12 at 19; 81-15 at 2-3.[12]

---

[12] Ms. Micheo still tries to create a disputed issue by arguing that Mr. Rodriguez received a pay increase when he kept the pay from his previous position at the Transportation Department within the company. Docket No. 99 at 6, 27. However, as Ms. Micheo points out, Mr. Rodriguez had already received a pay increase when he went to the Transportation Department. To be treated unfairly Ms. Micheo would have had to similarly change departments and without having received an equivalent increase in pay. However, Ms. Micheo never changed departments. As a result, she never received a salary increase. Thus, the fact that Mr. Rodriguez kept the pay increase is not probative of disparate treatment of Ms. Micheo and Mr. Rodriguez. *See Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003) (finding that the similar situated employees "need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances." (internal quotations omitted)).

Thus, Stericycle has provided a legitimate non-discriminatory reason to explain why Ms. Micheo was not been promoted and why the "Program Manager" position was never created.

## C. Pretext

Once the employer provides a legitimate, non-discriminatory reason as to why it took the adverse employment action, the burden shifts back to the employee to show the employer's reason for the adverse action was false and a pretext for discrimination. *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 673 (1st Cir. 1996).

Here, Ms. Micheo puts forth as proof of pretext that Mr. Rodriguez and Ms. Micheo were similarly situated and yet Mr. Rodriguez was the "Program Manager" and she was not. Docket No. 99 at 28-29. Ms. Micheo's arguments are unavailing.

First, as stated above, there was no "Program Manager" position. Second, Ms. Micheo's argument that the difference in pay between Mr. Rodriguez and Ms. Micheo supports an inference of gender discrimination is incorrect. The undisputed facts show that any difference in pay is attributed to Mr. Rodriguez's transfer from the BioSystem program to the Transportation Department. Then, when he transferred back to BioSystem his pay was not readjusted. Third, the record shows that management treated both Mr. Rodriguez and Ms. Micheo equally. According to Mr. Rodriguez's testimony, the only reason why he needed to follow up with Ms. Micheo was because she was not doing her work properly. Docket No. 81-12 at 14. Although it might have been unfair for Ms. Micheo to have her work being second-guessed by a Mr. Rodriguez, this unfairness, by itself, does not amount to gender discrimination. *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999) (finding that although plaintiff may not have been treated fairly, there was no evidence that the employer's decision was a pretext for unlawful discrimination).

Based on the analysis above, the Court finds that Ms. Micheo has failed to show the existence of a genuine issue of material fact both as to the prima facie and pretext analysis in relation to her Title VII gender discrimination claim. Accordingly, her Title VII gender discrimination claim is **DISMISSED** *with prejudice.*

## II.    Title VII – Retaliation

Ms. Micheo argues that she was placed on a PIP, suspended from work, and terminated from Stericycle for filing an ADU/EEO complaint and sending emails to the HR department alleging unequal treatment with co-workers. Docket No. 99 at 32-33. The Court disagrees.

Like her gender discrimination claim, Ms. Micheo's retaliation claim is governed by the *McDonnell Douglas'* burden shifting scheme. *Lockridge*, 597 F.3d at 472 (citing *Calero–Cerezo*, 355 F.3d at 25–26). Thus, Ms. Micheo must first establish a *prima facie* case of retaliation by showing that "(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Marrero*, 304 F.3d at 22). Ms. Micheo contends that she has established all prongs of the *prima facie* case.

### A.  Prima Facie

### 1.  Protected Conduct

Stericycle argues that only the October 22, 2013 letter written by Ms. Micheo's counsel stating her intent to sue and the ADU/EEOC charge filed on November 8, 2013 should count as instances of protected conduct. Docket No. 81-1 at 15-16. Ms. Micheo contends that, on top of the letter and the ADU/EEOC charge, all her emails to Mr. Santana in which she complained of

retaliation fall within the protected conduct of "informal protest." Docket No. 99 at 32. The Court disagrees.

"An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Fantini*, 557 F.3d at 32 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)) (internal quotation marks omitted). Protected conduct also includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (quoting *Fantini*, 557 F.3d at 32).

Here, the email sent by Ms. Micheo, Docket No. 105-11, is not the kind of protected conduct envisioned by the Title VII retaliation provision. First, the email does not allege, or allows an inference of, gender discrimination. *Brown v. Nat'l Penn Ins. Servs. Grp., Inc.*, 614 F. App'x 96, 99 (3d Cir. 2015) ("A general complaint of unfair treatment is not a protected activity under Title VII . . . a plaintiff must show that she complained about unlawful discrimination specifically.") (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)) (internal quotation marks omitted). Thus, the Court will not consider the emails sent to Mr. Santana as protected conduct.

The Court finds that the letter that Ms. Micheo's counsel wrote to Stericycle stating her intent to sue and the ADU/EEOC charge filed on November 8, 2013, were protected conduct. In other words, all actions after October 22, 2013, will be looked at through a retaliatory animus lens.

### 2.   Adverse Employment Action

Turning to the adverse action prong, Stericycle argues that the only adverse actions taken against Ms. Micheo were placing her on the PIP and her termination from employment at Stericycle. Docket No. 81-2 at 15. The Court disagrees.

To constitute an adverse employment action, the action has to be "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Planadeball*, 793 F.3d at 176 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "However, petty slights or minor annoyances that often take place at work and that all employees experience are not material adverse actions and consequently, fall outside the scope of the anti-discrimination laws." *Id.* (quoting *Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) (internal quotation marks omitted)).

Here, Ms. Micheo's December suspension for failure to sign the PIP may constitute an adverse employment action. Suspending someone from work, presumably without pay, can be a powerful deterrent against making or supporting a charge of discrimination. Thus, the Court finds that Ms. Micheo's suspension was an adverse employment action. Accordingly, the Court will analyze if there is a causal connection between the protected conduct and the PIP, the suspension, and the termination.

### 3.   Causally Connected

Focusing now on causation, Ms. Micheo argues that because of the temporal proximity between the protected conduct and the adverse actions, Ms. Micheo's ADU/EEOC charge and her counsel's letter threatening to sue are the cause of the PIP, suspension, and ultimately the termination of her employment with Stericycle. *Id.* at 34. The Court agrees.

Generally "[t]emporal proximity can create an inference of causation in the proper case." *Planadeball*, 793 F.3d at 177 (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006)). In order to draw that inference, Ms. Micheo needs to prove that the decision-maker had knowledge of Ms. Micheo's protected conduct. *Id.*

Here, as evidenced in her emails with Mr. Santana and Mr. Rivera, Ms. Bloomfield knew that Ms. Micheo had engaged in protected conduct. Docket No. 105-13. Further, Ms. Bloomfield was involved in the decision to terminate Ms. Micheo from Stericycle. Docket No. 81-52. Thus, Ms. Bloomfield, as the decision-maker, knew that Ms. Micheo had engaged in protected conduct. Because Ms. Bloomfield knew about Ms. Micheo's protected conduct and she was the decision-maker creating a PIP, suspending her, and terminating her form Stericycle, coupled with the temporal proximity between the two situations, a causal connection may be inferred. *See, e.g., Mariani−Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007) (concluding that "the 'temporal proximity' between [plaintiff's] allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a *prima facie* case of retaliation."); *Sánchez−Rodríguez v. AT & T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012) (holding that the plaintiff established a *prima facie* case of retaliation where approximately three months had passed between the protected conduct and the material adverse action). Thus, a causal connection can be drawn between the adverse employment action and the protected conduct.

Accordingly, taking all the inferences in Plaintiff's favor, Ms. Micheo has established a *prima facie* case of retaliation based on Title VII.

### B.  Legitimate, Non-Discriminatory Reason

Because Ms. Micheo has made a *prima facie* case of retaliation, the burden shifts to Stericycle to show that it had a non-retaliatory reason for the PIP, suspension, and termination of Ms. Micheo's employment from Stericycle. *See Mariani–Colón*, 511 F.3d at 221, 223. The Court finds that Stericycle has overwhelmingly satisfied that burden. Any adverse action towards Ms. Micheo was taken because of her disciplinary problems—namely becuase she was insubordinate, Docket Nos. 81-24; 81-36; 81-39; 81-40; 81-41; 81-43; 81-44; did not follow management directives, Docket Nos. 81-45; 81-49; and was not complying with her job duties when supervising hospitals, Docket Nos. 97-4 at 39-40; 81-12 at 10-11. Thus, the Court finds more than enough evidence in the record to support Stericycle's non-discriminatory reasons for the PIP, the suspension, and the termination.

### C.  Pretext

The burden now shifts to Ms. Micheo "to show that the defendant's explanation is a pretext for unlawful retaliation." *Planadeball*, 793 F.3d at 175. Ms. Micheo falls short of the mark.

To defeat summary judgment, Ms. Micheo has to raise a genuine issue of material fact as to whether her October 22, 2013 letter to Stericycle and her ADU/EEOC charge was the "but for cause" of her adverse employment actions. Ms. Micheo argues that the falsity of the incidents attributed to the PIP and Stericycle's deviation from its internal policy on termination of employees on a PIP are ample evidence of pretext. Docket No. 99 at 34. The Court disagrees.

Ms. Micheo has not established enough evidence to prove that the allegations in the PIP are false. Furthermore, Stericycle followed its Handbook in handling Ms. Micheo's employment situations. Mr. Santana gave her more than ample verbal warnings that she needed to go to the

Civil No. 15-1097 (JAG)                                                                                    28

hospitals on the days that she was scheduled for visits, stop her insubordination, and cooperate with her co-workers. Docket Nos. 81-23; 81-26; 81-28; 81-29; 81-35; 81-36; 81-39; 81-40; 81-41; 81-43; 81-44; 81-45. However, Ms. Micheo did not follow any of Mr. Santana's directives. As a result, because of her past violations and culminating in the last incident at Santa Rosa Hospital, Docket Nos. 81-49; 81-50; 81-51, which was in clear violation of the PIP, she was terminated from Stericycle.[13]

Moreover, Ms. Micheo has put forth no additional evidence that allows an inference that her treatment and, ultimately, her dismissal was gender motivated. The fact that her supervisors, who moved Mr. Rodriguez between departments and reprimanded her when she was out of line, were male, absent some other evidence, does not create the inference that they were discriminating against Ms. Micheo based on her gender. *Rivas Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 534 (1st Cir. 2002) (finding no gender discrimination when the only discriminatory evidence is that the plaintiff's male supervisors investigated and fired her).

Accordingly, Ms. Micheo's retaliation claim based on Title VII is **DISMISSED** *with prejudice.*

---

[13] The Court notes that this is precisely the kind of decision the Court should avoid. As a court of limited jurisdiction, a district court cannot act as a super personnel department going into each and every employment dispute that litigants may have. *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 22 (1st Cir. 1999) ("As this court has previously explained, [c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality of employers' nondiscriminatory business decisions." (internal quotation marks omitted)).

III.    **State Law Claims**

This Court should decline to exercise supplemental jurisdiction over a plaintiff's state law claims when all federal claims are dismissed. *See Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998) (holding that "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation."). Because the Court dismisses all of Plaintiff's federal claims, the Court hereby DISMISSES *without prejudice* any claims made under Puerto Rico law.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Stericycle's Motion for Summary Judgment.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 31 day of March, 2017.

s/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge